LOUIS A. HIGHMAN, State Bar No. 61703
LAWRENCE BALL, State Bar No. 60496
HIGHMAN, HIGHMAN & BALL
A Professional Law Association
870 Market Street, Suite 467
San Francisco,CA 94102
Telephone:  (415) 982-5563
Facsimile:  (415) 982-5202

Attorneys for Plaintiff Debra Rodriquez

In the United States District Court

In and for the Northern District of California

| | |
|---|---|
| DEBRA RODRIGUEZ, | Civ. No. C 07-2985 EMC |
| Plaintiff, | COMPLAINT FOR DAMAGES-- VIOLATION OF TITLE VII (SEX DISCRIMINATION AND RETALIATION); |
| -v- | |
| HILTI, INC., | VIOLATION OF THE ADEA (AGE DISCRIMINATION); |
| Defendant. | VIOLATION OF CALIFORNIA FAIR EMPLOYMENT AND HOUSING ACT (SEX DISCRIMINATION, AGE DISCRIMINATION, AND RETALIATION) |
| _____/ | |
| | DEMAND FOR JURY TRIAL |

Plaintiff Debra Rodriguez alleges as follows:

JURISDICTION, VENUE, AND PARTIES

1.    This Court has original jurisdiction of the First Cause of Action herein, which is brought under Title VII of the 1964 Civil Rights Act, and specifically under 42 U.S.C. Sections 2000e-2, 2000E-3, and 2000e-5.   The Court has original jurisdiction of this action under 28 U.S.C. Section 1331 and 28 U.S.C. Section 1343.

2.    This Court has original jurisdiction of the Second Cause of Action, which is brought for violation of the Age

1  Discrimination in Employment Act, 29 U.S.C. Sections 623 et
2  seq.   The Court has original jurisdiction of this cause of
3  action under 29 U.S.C. Section 626 and 28 U.S.C. Section 1331.

4      3.  This Court has supplemental, pendent, and ancillary
5  jurisdiction over the Third Cause of Action (violation of the
6  California Fair Employment and Housing Act provisions related
7  to sex discrimination, age discrimination, and retaliation),
8  which is a state law claim.

9      4.  The   unlawful   actions   of   defendant   Hilti,
10 Inc.,(hereinafter "Hilti" or "Hilti, Inc.") and its unlawful
11 employment practices herein alleged were committed in the
12 State of California and in the judicial district of this
13 Court.

14     5.  Plaintiff Debra Rodriguez currently resides in the
15 County of Newton, State of Georgia.   However, she was a
16 resident of the judicial district of this Court in the State
17 of California for almost all of the time period during which
18 the wrongful conduct addressed herein occurred, and for which
19 relief is being sought, and was employed by defendant Hilti,
20 Inc. in the judicial district of this Court in the State of
21 California for said same time period.

22     6.  Defendant Hilti, Inc. is a corporation operating in
23 the State of California and the judicial district of this
24 Court.

25                    FACTUAL ALLEGATIONS

26     7.  Plaintiff refers to the allegations of paragraphs 1-
27 6 of this complaint, and incorporates the same herein by this
28 reference as though set forth in full.

8.    Plaintiff was employed by defendant Hilti from in or about May, 1980 to in or about September, 2001. Plaintiff resigned from her employment with defendant Hilti at that time to help care for and spend time with her mother, who was dying of cancer. Plaintiff returned to employment with defendant Hilti in or about November, 2003.  Plaintiff resigned from her employment with defendant Hilti on or about April 20, 2005.

9.    Plaintiff was hired by defendant Hilti at their corporate office in Tulsa, Oklahoma in May 1980 as a Sales Planning Secretary to the Director of Sales Planning.  In 1981 plaintiff was promoted to a Sales Planning Analyst and worked in this position until 1988.  This was an exempt salaried position.  She worked with the Regional Managers realigning sales and territory geographical boundaries.  If an area in the United States had economical changes, then she would work with the Regional Managers on closing territories or opening new territories in a growth area.  Plaintiff traveled to the Division Offices (Dallas, San Francisco, Chicago, Atlanta and Stamford, CT) and worked with the Sales Planning Managers and Division Managers to develop sales forecasts by territory and regional level and create cost center budgets for field travel and business expenses. When new reporting systems were developed, plaintiff went out and presented them to the Division Offices.  When new Sales Planning Managers were hired, plaintiff went to the Division office and trained them.  Information from the Division office was sent to plaintiff to consolidate at the corporate

1    level. Plaintiff calculated Regional Manager Bonus payments

2    on a quarterly basis.  Plaintiff worked directly with the

3    Regional Managers on sales promotions and prize payouts.

4         10.  In 1988 plaintiff was transferred by Hilti to the

5    Marketing Research Department as a Marketing Research

6    Analyst.  Plaintiff ran the department by herself with

7    temporary college student help in summers. She conducted

8    surveys with Hilti customers regarding customer satisfaction,

9    new product ideas, and complaints.  Plaintiff traveled to

10   various parts of the United States and held focus groups on

11   new product ideas that were being developed by Hilti.

12   Plaintiff worked with F.W. Dodge and McGraw Hill to develop

13   sales leads and construction activity information to send to

14   the Regional Managers.  Plaintiff did research on different

15   market trends and presented this research and statistical

16   market data to the executive management board on a quarterly

17   basis.  Once a year plaintiff attended the sales convention

18   and held a meeting with all the regional managers and

19   presented new construction lead software updates for Hilti's

20   construction activity data base.  Plaintiff kept abreast of

21   current market trends and competitive information and

22   distributed the information to the regional managers and

23   upper management.  In late 1993 and first quarter 1994

24   plaintiff worked with each regional manager to realign the

25   sales force in connection with developing strategic business

26   markets for Hilti sales.

27        11.  From in or about July 1994 to in or about September

28   2001, plaintiff worked as a Mechanical/Electrical sales

1  representative for defendant Hilti in San Jose, California and
2  in the East Bay (in California). In that position she
3  consistently performed at a very high sales level and ranked
4  in the top ten percent of the sales force.  She consistently
5  received very positive feedback and very good performance
6  reviews. She was a President's Club winner three times, which
7  was the award for the top 50 sales performers.  She also
8  received the Master's Club award, which was the next level of
9  high achievement recognition.

10      12.  Plaintiff resigned from her employment with
11  defendant Hilti in or about September 2001 to help care for
12  and spend time with her mother, who was dying of cancer.  At
13  that time she was told by Gil Morris, President, that she
14  could come back any time she wanted.

15      13.  In or about November 2003 plaintiff contacted Stan
16  Gilson (District Sales Manager), stating that she wanted to
17  return to work for defendant Hilti. Mr. Gilson had been one of
18  plaintiff's Regional Managers during her eights years as a
19  Mechanical/Electrical sales representative.  She asked about a
20  sales account manager position. Mr. Gilson told plaintiff that
21  she had served her time as an account manager, that he had
22  received headcount approval for a Senior Account Manager (SAM)
23  several months before, that he needed plaintiff in that
24  position because the Mechanical/Electrical sales team had lost
25  a lot of the large accounts in the Bay Area while plaintiff
26  was gone, and he needed that business back.

27      14.  There were 13 approved SAM positions in the
28  company, most of which had already been filled by successful

1  sales people, before plaintiff was hired into the SAM
2  position. The Senior Account Manager position (SAM) was
3  something like a key account manager.  In the SAM position,
4  the SAM was supposed to concentrate his or her efforts on 10
5  large accounts to increase his or her sales to these accounts,
6  and to also cover all the jobsites in his or her respective
7  geographical area. Plaintiff started in her SAM position on or
8  about November 3, 2003.  Plaintiff is informed and believes
9  there were two females in SAM positions, and eleven males.
10  The Senior Account Manager position had a salary and a bonus
11  plan that was based on the sales growth of the accounts.

12      15.  Plaintiff's SAM position covered all the geography
13  that the Bay Area Mechanical/Electrical team of four covered.
14  Plaintiff was told by Stan Gilson "to get that business back".
15  At the time of plaintiff's interview, Mr. Gilson told
16  plaintiff that it was very important for her to be mobile,
17  because the Senior Account Manager position would be a
18  stepping stone to a Regional Manager position if she were
19  successful.

20      16.  On or about March 9, 2004, at a Regional Sales
21  Meeting, plaintiff had lunch with Gil Morris, President. He
22  encouraged plaintiff to start thinking about where "she
23  wanted to get back to" and what other jobs she would like to
24  do. He also stated that because of VISION 2008, the plan to
25  double sales worldwide by 2008, Hilti needed people like her.
26  He said he was very proud of plaintiff's sales results and
27  was very glad to have her back. Mr. Morris also told
28  plaintiff she needed to increase her sales base by $200,000

Complaint—Debra Rodriguez v. Hilti, Inc.

1  and asked her if she could do it. Plaintiff said yes.

2  (Plaintiff reached that goal by on or about November 15,

3  2005.)

4      17.  On or about March 12, 2004, Stefan Lang,

5  plaintiff's immediate supervisor and Regional Sales Manager,

6  called her and asked her how mobile she was. Plaintiff told

7  him that her husband and she had discussed their mobility

8  after her recent meeting with Mr. Morris, and they were

9  willing to move from the Bay Area. Mr. Lang told plaintiff

10  that he was putting her in for promotion status, and that he

11  needed to meet plaintiff for lunch to discuss promotional

12  opportunities.

13      18.  On or about April 4, 2004, Mr. Lang spent the

14  morning with plaintiff, meeting her customers. They also went

15  to lunch together. Mr. Lang told plaintiff that the lunch was

16  about her, that it had been decided that she could go

17  anywhere she wanted to go and do any position she wanted.

18  Plaintiff asked if he was going to give her any choices. He

19  said no - this is how it works. Plaintiff was to let the

20  company know where she wanted to go and the company would get

21  her there. Plaintiff and Mr. Lang spent hours discussing her

22  qualifications and her 21 years of experience with the

23  company. Mr. Lang agreed that plaintiff could go anywhere

24  because of the combination of her excellent sales results and

25  her 14 years of corporate sales planning and marketing

26  research experience. Mr. Lang agreed that plaintiff's

27  situation was very unique. Most people would start in the

28  field and then go to corporate, whereas plaintiff had done

1  the opposite.

2      19. After discussing what positions were available, Mr.

3  Lang agreed that plaintiff would make a good Regional

4  Manager. Mr. Lang said that Charlie Martorello, Vice

5  President, Western Division would not put plaintiff's name in

6  for promotion at that time (April 2004), but would do so in

7  the fall of 2004. Plaintiff and Mr. Lang both agreed that

8  plaintiff would stay in her present job through December 2004

9  and get whatever training she would need during that time.

10     20.  Plaintiff was actually relieved because she was

11  enjoying the SAM position and her husband had just started a

12  new job in March 2004 and wanted to wait so he could also

13  transfer with his company.

14     21.  Mr. Lang also said that he would support plaintiff

15  in whatever she wanted to do. They also talked about where

16  plaintiff wanted to go. Plaintiff said that she would like to

17  check out the Charlotte North Carolina area. Mr. Lang stated

18  that Jim Tate, was the Regional Manager out there and that by

19  the time plaintiff was ready to move, Mr. Tate should be

20  ready to be promoted. Mr. Lang said plaintiff could take any

21  classes during the year that she wanted. Mr. Lang did not

22  mention anything about plaintiff not being qualified for the

23  position or of Mr. Martorello having any "misgivings about

24  her skills to manage 10 account managers". Plaintiff saw Mr.

25  Martorello at the Oakland, California store several times and

26  at meetings over the next six months and he never brought up

27  anything about her allegedly being "impatient with sales

28  representatives" or about having any "reservations" about her

1  in a Regional Manager position.

2      22.   Plaintiff and her husband spent the next few months

3  researching the Charlotte area. Plaintiff told Mr. Lang that

4  they had made plans to visit Charlotte in June 2004 to look

5  around. He encouraged plaintiff to go, and talked constantly

6  about plaintiff getting promoted. He even went as far to joke

7  about him taking plaintiff's job, because of the bonuses she

8  was making on the high growth of her accounts.

9      23.   In or about April 2004 plaintiff attended a Senior

10  Account Manager meeting in Tulsa, Oklahoma, along with the

11  other 12 Senior Account Managers. During this time plaintiff

12  talked with Marcus Oden, Director of Human Resources. She

13  told Mr. Oden about Mr. Lang assuring and representing to her

14  she would be promoted to a Regional Manager at the end of

15  2004. Plaintiff and Mr. Oden discussed at that time the

16  training involved for the Regional Manager position. Mr. Oden

17  said that Mr. Lang would have to coordinate that for

18  plaintiff after the end of the year, because most of the

19  training would come after she was promoted. Mr. Oden did not

20  mention anything about plaintiff not being qualified to be a

21  Regional Manager during this discussion nor did he mention

22  anything about her performance or work, past or current, that

23  would keep her from becoming a Regional Manager.

24      24.   Plaintiff and her family went to Charlotte on or

25  about June 12, 2004, and spent a week looking around.

26      25.   Plaintiff met with Mr. Lang or about July 6, 2004,

27  and told him they had really liked the Charlotte area.

28  Plaintiff and Mr. Lang discussed the trip and plaintiff's

1  promotion. At that time plaintiff specifically asked Mr. Lang

2  whose idea it was to promote her. He said it was Stan Gilson

3  and himself. Mr. Lang told plaintiff they both thought that

4  she was a talented and an outstanding performer and that

5  "Hilti takes care of and rewards their valuable employees".

6  He said to sit back and wait to see what Jim Tate's (Regional

7  Manager in Charlotte) plans were.

8      26.  In or about July 2004 plaintiff's husband declined

9  an offer of a promotion within the company he worked for. He

10 and plaintiff believed they would soon be moving when she

11 received a promotion to the position of Regional Manager.

12 They believed it would have been unfair to her husband's

13 company for her husband to take a promotion and then leave.

14     27.  In or about August 2004, plaintiff was told by Mr.

15 Lang that he, Mr. Lang, had told Mr. Martorello that

16 plaintiff was interested in the Charlotte Regional Manager

17 position. Soon thereafter, plaintiff received an email from

18 Mr. Lang  stating that Mr. Martorello had called Gil Morris,

19 President of Hilti, and let him know that plaintiff was

20 interested in the position and for plaintiff to wait until

21 she heard something from Mr. Martorello or Mr. Morris.

22     28.  A few weeks later plaintiff was told by Mr. Lang

23 that it had been determined that Jim Tate would not be

24 leaving the Charlotte position because of personal problems.

25 Mr. Lang told plaintiff that they should start looking

26 someplace else.

27     29.  In or about August 2004 Mr. Lang called plaintiff

28 and said that Charlie Martorello needed to go on sales calls

1   with her and would discuss her promotion.  However, Mr.

2   Martorello did not put plaintiff on his schedule until on or

3   about October 13, 2004.

4        30.  Mr. Martorello had been the Vice-President of Sales

5   for the Western Division for 17 years. Plaintiff is informed

6   and believes that during his time as the Vice-President of

7   Sales, Western Division, Mr. Martorello had only promoted one

8   woman salesperson into a Regional Manager position and that

9   was back in or about 1995. Plaintiff is further informed and

10  believes that the aforesaid female was a personal friend of

11  the wife of Mr. Martorello. Plaintiff is informed and

12  believes that in 2004, there were no female Regional Managers

13  in Mr. Martorello's division, that there were no female

14  Regional Managers in Training in Mr. Martorello's division,

15  and that no females had been promoted or interviewed for

16  those management positions in the Western Division under

17  Charlie Martorello for in or about over 9 years.

18       31.  The meeting of October 13, 2004, was the first time

19  Mr. Martorello had ever ridden with plaintiff in the eight

20  plus years she had worked under him. During the five hour

21  ride-a-long with Mr. Martorello on October 13, 2004,

22  plaintiff explained to him what Mr. Lang had said regarding

23  promotion opportunities for her to be a Regional Manager. She

24  told Mr. Martorello that they had decided on the North

25  Carolina area and that if things had changed she needed to

26  know.

27       32.  Mr. Martorello told plaintiff that he could not see

28  her as a Regional Manager because according to him she had no

1  patience. Plaintiff asked him what he meant and if there was
2  a specific incident or something else he was referring to.
3  Mr. Martorello said no.

4      33.  In plaintiff's approximately eight years as a sales
5  representative she was often called upon for help by other
6  sales people with problem accounts. Other sales people
7  frequently rode with her to learn selling skills. She was
8  frequently asked to have corporate managers and executives
9  ride with her. Plaintiff was very good friends with most of
10  the other sales people in the Bay Area, especially the
11  successful ones like herself. From 1994 to 2001, plaintiff
12  received no written or verbal documentation regarding her
13  being openly critical of other co-workers or of other sales
14  people complaining about her. In none of her annual
15  Performance Management Process (PMP) reviews was she ever
16  told she had poor interpersonal skills. In fact, her 1999
17  sales performance review states that she was a team leader
18  and group player.

19      34.  Mr. Martorello told plaintiff that he could see her
20  as a Firestop Specialist or a Diamond Specialist. These
21  positions would not be a promotion for plaintiff but a
22  lateral transfer. Plaintiff said she was not interested in
23  these types of positions because they were still sales
24  positions, that after eight years of being a very successful
25  salesperson, she had learned everything she could possibly
26  learn from selling, achieved every award that she could and
27  that there were no challenges left in the position. Plaintiff
28  also stated that at her age it was time for her to do

1  something else with the company instead of driving around in
2  a jeep all day carrying tools.

3      35. Mr. Martorello said he thought plaintiff should be a
4  Regional Manager in Training (RMIT) first. Plaintiff told Mr.
5  Martorello that she and Mr. Lang had decided that with her
6  extensive sales planning and marketing corporate background,
7  her personal business employment experience and her excellent
8  sales skills, that she should be able to go directly into a
9  Regional Manager position.

10     36.  Mr. Martorello offered plaintiff an Account Manager
11 position in Hawaii. Plaintiff told him she was not interested
12 because it was a demotion and still a sales position. He
13 stated that plaintiff could go back to corporate and have a
14 pick of any position she wanted there. Plaintiff told him she
15 liked the sales end of the company and was not interested in
16 moving back to Tulsa, Oklahoma.

17     37.  Finally after going back and forth for about two
18 hours, Mr. Martorello agreed to bring plaintiff's name up to
19 the promotion board that was meeting the next week in Tulsa
20 to talk about promotable candidates. He told plaintiff that
21 Vince Caggiano, Vice-President of Hilti's Industrial
22 Division, had a Regional Manager position available in the
23 North Carolina/South Carolina area and that he (Mr.
24 Martorello) would call Mr. Caggiano and talk to him and that
25 he (Mr. Martorello) would bring up her name during the
26 promotion board meeting and see what came up. He told
27 plaintiff he would call her when he came back.

28     38.  Plaintiff told Mr. Martorello that she was very

1  interested in the Regional Manager position in the North

2  Carolina/South Carolina area which he was speaking to her

3  about, and that she was willing to make a 10 year commitment

4  to Hilti if she moved, and that she planned on retiring when

5  she was 59 1/2 years old.

6      39.  Mr. Martorello brought up an issue with plaintiff

7  about her alleged lack of patience one time in that 5-hour

8  day, but never elaborated on what he was referring to. This

9  alleged issue had never come up before with any of

10  plaintiff's managers, past or present.

11      40.  During this same day, Mr. Martorello also told

12  plaintiff he had put her name in to Marcus Oden in Tulsa for

13  a Sales Recruiter position along with three other candidates.

14  He said they needed someone in that position that was very

15  professional, that would represent the company well, thought

16  a lot about the company, and would recruit the right type of

17  people from colleges for open sales positions. He said that

18  he thought the position would be perfect for the plaintiff.

19  Plaintiff and Martorello talked about the position being in

20  Tulsa, and he said he thought that due to the volume of

21  hiring for Vision 2008, that there eventually would be an

22  East and West recruiter and that she could probably live

23  wherever she wanted.

24      41. Plaintiff never heard anything back from Marcus Oden

25  in Human Resources regarding this Sales Recruiter position or

26  an opportunity to interview for the Sales Recruiter position.

27      42. Plaintiff is informed and believes that over the

28  next few weeks Mr. Lang had several conversations with Mr.

1  Martorello in which Mr. Martorello brought up alleged things
2  about plaintiff from the past, and in response Mr. Lang told
3  Mr. Martorello that he did not see plaintiff the way Mr.
4  Martorello saw plaintiff. Plaintiff asked Mr. Lang what these
5  past issues were, but Mr. Lang indicated that he was not
6  given any specific information.

7      43. After two weeks of waiting for a response from Mr.
8  Martorello, plaintiff e-mailed him on October 29, 2004, and
9  received a reply to call him on the following Monday and he
10 would talk about it. When they talked on November 3, 2004,
11 Mr. Martorello told plaintiff that "everyone" at the meeting
12 was surprised that she would want to be a Regional Manager.
13 Mr. Martorello said he thought that plaintiff should first go
14 into a Regional Manager in Training (RMIT) program. He said
15 that Gil Morris, President, suggested that plaintiff be an
16 RMIT first before becoming a Regional Manager. He stated that
17 plaintiff would get the necessary experience with account
18 manager interactions through the RMIT program. Plaintiff told
19 him that she felt she was beyond needing that, but if that
20 was required she would do it. Plaintiff voiced her concerns
21 about having to move twice, because of her husband's career
22 and her 10 year old's schooling. He said after serving her
23 time as an RMIT that she could pick three places, and Hilti
24 would commit to getting her to one of them. Mr. Martorello
25 offered plaintiff an interview for an RMIT position in
26 Phoenix the following Tuesday, November 10, 2004.

27     44. Plaintiff asked Mr. Martorello if he had talked to
28 Vince Caggiano regarding the Regional Manager position in the

1  North Carolina/South Carolina area which Mr. Martorello had
2  told her about. Mr. Martorello said that the Regional Manager
3  position in the North Carolina/South Carolina area he had
4  spoken to her about had been filled by one of the male
5  candidates he, Mr. Martorello, had interviewed the prior week
6  in Portland.

7      45.  Plaintiff prepared a promotion presentation for the
8  interview for the Regional Manager in Training position for
9  Phoenix and sent a copy to Stefan Lang. The presentation
10 included her corporate background, her experience running two
11 businesses, her sales background, and a plan to reach VISION
12 2008 goals. Stefan Lang commented that he thought it was a
13 great presentation and that she had done a good job preparing
14 it, and he gave her some Vision 2008 goals to add to it.

15     46.  Plaintiff went to the interview for the Regional
16 Manager in Training position for Phoenix on or about November
17 9, 2004.  The interview took place in Charlie Martorello's
18 office, which was located in Walnut Creek, California case.
19 Prior to the interview with plaintiff, Charlie Martorello and
20 Casey Blim (the Regional Manager in Phoenix) were
21 interviewing the only other candidate plaintiff is aware of
22 who was up for the position of RMIT in Phoenix, whose name
23 was Chris Tindiller.  Plaintiff heard the entire interview
24 with Chris Tindiller because the door to the office was open,
25 and plaintiff was right outside the door in the hallway
26 (which was where she had been told to wait).  When it was
27 time for plaintiff's interview, plaintiff did a slide show
28 Powerpoint presentation regarding her nine years of sales

1   planning experience in corporate which consisted of working
2   with Regional Managers on sales planning, forecasting,
3   territory realignments, and other field related projects. She
4   also included in the Powerpoint slide show presentation a
5   presentation as to her work as a marketing research analyst
6   for the company in which she, for six years, performed
7   marketing research duties, during which time she worked on
8   customer and field sales surveys, provided sales leads to the
9   Regional Managers, and did focus groups with Hilti customers
10  on new product ideas. In her marketing research analyst
11  position, plaintiff had worked very closely with the
12  President and Vice Presidents of Marketing. Also included in
13  plaintiff's Powerpoint presentation was a presentation on the
14  two businesses plaintiff had owned.  One of these businesses
15  was an arts and crafts business which she had worked on for
16  seven years on weekends.  The second of these businesses was
17  a fire sprinkler company which she and her husband had owned
18  from 2000 to 2003, and of which she was Vice President.  In
19  this fire sprinkler company business, there were
20  approximately 32 employees who plaintiff had helped supervise
21  in the field and office. She had also kept up relations with
22  the fire sprinkler company's customers and the scheduled
23  work. Plaintiff's Powerpoint presentation also included her
24  sales success from her two sales positions with Hilti and a
25  summary of the areas she would focus on to help accomplish
26  VISION 2008. Plaintiff did not focus solely on her sales
27  skills as her only success, but showed all of her various
28  skills, including managerial skill, teamwork skills,

1   marketing research skills, planning skills, leadership
2   skills, etc.

3       47.   The only other person plaintiff is aware of who
4   interviewed for the Phoenix Regional Manager in Training
5   position for Phoenix was Chris Tindiller.  As indicated
6   previously, above, plaintiff heard this interview, as she was
7   outside in the hallway with the door to the office open.
8   Tindiller was a young male college graduate.  Plaintiff is
9   informed and believes that he had been with Hilti for less
10  than a year.  Plaintiff is not aware of Tindiller presenting
11  a Powerpoint presentation, like plaintiff did.

12      48.   Nothing was discussed with plaintiff during the
13  interview regarding her allegedly not being qualified for the
14  Regional Manager in Training position for Phoenix.

15      49.   At the interview for the Regional Manager in
16  Training position for Phoenix, plaintiff never really got to
17  talk about what Casey Blim was looking for, because she spent
18  the time trying to defend herself from Mr. Martorello's
19  allegations of a lack of patience on her part. Plaintiff once
20  again asked Mr. Martorello to give her specifics on this
21  issue, but he never gave her any.  Plaintiff finally was able
22  to ask Mr. Blim a few questions about the RMIT position, but
23  that was about the extent of the interview.

24      50.   During this interview for the RMIT position for
25  Phoenix, plaintiff told Mr. Martorello that she needed his
26  support with regard to her promotion to the RMIT position and
27  felt like she was not getting his support. Mr. Martorello
28  said he was being supportive.  Plaintiff asked Mr. Martorello

1  why there were no female Regional Managers in the Western
2  Division. She pointed out to Mr. Martorello that he had no
3  female Regional Managers, nor had there been any for over
4  five years. In response Mr. Martorello mentioned a female
5  named Betsy Starr, who had been a Regional Manager under Mr.
6  Martorello.  Plaintiff replied that Ms. Starr had been
7  promoted back in 1995 and had been gone for five years, and
8  no women had been promoted since that time.

9      51.  During this interview it became clear to plaintiff
10 that it had already been decided that Mr. Tindiller was going
11 to be put into the Phoenix RMIT position.  This is indeed
12 what happened.

13     52.  During the interview for the Phoenix Regional
14 Manager in Training position, Mr. Martorello brought up an
15 RMIT position which had been approved for the Bay Area under
16 Bill Holden, Construction Regional Manager. Mr. Martorello
17 said he wanted plaintiff to talk to Bill Holden the next day
18 (which was under the construction division).  He also
19 suggested plaintiff talk to Vince Caggianno, the Vice-
20 President of Industrial Sales, to see if he had any openings
21 for Regional Managers.

22     53.  That same evening plaintiff e-mailed Mr. Martorello
23 a copy of her Powerpoint presentation (since she hadn't left
24 him a copy that day). In her email she told Mr. Martorello
25 that it was time he started concentrating on her performance,
26 instead of "old history".

27     54.  The next morning, on or about November 10, 2004,
28 Stefan Lang e-mailed plaintiff a copy of an e-mail Mr.

1  Martorello had e-mailed out that same morning, which was
2  entitled "Bay Area SAM - I'm sold!!" Mr. Martorello had sent
3  out an e-mail praising plaintiff and her sales
4  accomplishments as a SAM (Senior Account Manager), copied
5  part of her presentation that included her year-to-date sales
6  results which were 279% over the prior year, and sent it to
7  all the Regional Managers in the company, as well as a copy
8  to Gil Morris, the President.

9      55.   That same day, on or about November 10, 2004,
10  plaintiff emailed her Regional Manager in Training
11  presentation which she had previously given to Mr.
12  Martorello, to Vince Caggiano, and then she telephoned Mr.
13  Caggiano.  Mr. Caggiano told plaintiff that there were not
14  too many people in the company with her background, that her
15  sales results were outstanding, and that her managers must be
16  very happy.  Mr. Caggiano said that he would be out in the
17  Bay area in January 2005 and would like to spend 4 or 5 hours
18  with plaintiff to talk about what she wanted to do and where
19  she was willing to go.  Plaintiff mentioned the patience
20  issue raised by Mr. Martorello. Mr. Caggiano agreed that
21  everyone changes, that he had had the same issues over the
22  years, and that he considered the past to be the past.

23      56.   Plaintiff then called Stefan Lang and told him what
24  Vince Caggiano had said. Mr. Lang told plaintiff not to put
25  all her eggs in one basket and to talk to Bill Holden
26  regarding the Bay Area Regional Manager in Training position.
27  Plaintiff said she would like to interview for everything she
28  could. Mr. Lang said he would call Bill Holden and arrange an

Complaint—Debra Rodriguez v. Hilti, Inc.            20

1    interview.

2        57.   Mr. Lang asked plaintiff how the interview went

3    with Mr. Martorello. Plaintiff explained that she didn't feel

4    like she even got an interview - that she spent the whole

5    hour defending herself and justifying why she wanted to be a

6    Regional Manager.  No questions were ever asked regarding the

7    Regional Manager in Training position, or regarding the

8    qualifications needed for it. Plaintiff said that Mr.

9    Martorello had this negative attitude and said that he had

10   told plaintiff there were five other people that felt the

11   same way he did. Plaintiff also told Mr. Lang that Mr.

12   Martorello brought her daughter up, and had asked her if she

13   would move with plaintiff or stay behind. Plaintiff told Mr.

14   Lang that she told Mr. Martorello that it was not his

15   concern.

16       58.   On or about November 10, 2004, plaintiff received a

17   phone call from Casey Blim, the Regional Manager in Phoenix.

18   He informed plaintiff that even though she was the most

19   qualified candidate for this RMIT (Regional Manager in

20   Training) position, it was given to Chris Tindiller. Mr. Blim

21   told plaintiff it didn't really matter how Chris Tindiller

22   performed because he was in a fast moving promotion program

23   called the Thunderbirds.

24       59.   Mr. Blim went on to tell plaintiff that someone in

25   Tulsa was "out to get her". Plaintiff asked who? Mr. Blim

26   said someone in Human Resources. Plaintiff said the only

27   person she knew in Human Resources was Marcus Oden. Mr. Blim

28   replied "Bingo".

60.  On or about November 10, 2004, plaintiff went to Hilti's Oakland, California Center and spoke with Bill Holden. They had an informal interview which started with Mr. Holden asking plaintiff "How would you like to move to Sacramento - that is where my RMIT position will be". Plaintiff said that it was probably okay, but she would have to discuss it with her husband. Mr. Holden said he had not interviewed anyone, but he thought plaintiff would be perfect for the job and that they would work well together. He said he needed plaintiff to go right away, so if she didn't sell her house quickly, then she could commute.

61.  Plaintiff told him that she and her husband had been working on their house for 8 months since this promotion process had started, and that considering the area she lived in, it should not be a problem to sell her house. Mr. Holden said that because of VISION 2008, the Sacramento RMIT position would probably become a Regional Manager position for all of Sacramento, and that most likely plaintiff would not have to move again.

62.  Mr. Holden told plaintiff that he had only one other candidate that he might have to interview from the Seattle/Portland area because he had promised he would do so.

63.  Mr. Holden asked plaintiff what she thought Mr. Martorello would think.

64.  Plaintiff told Mr. Holden that during the interview for the Phoenix RMIT position the day before, Mr. Martorello had specifically brought up the Bay Area RMIT position and asked plaintiff to call and talk to Mr. Holden

1  about this specific RMIT position. Mr. Holden said he would

2  talk to Mr. Martorello and get back to plaintiff.

3      65.  On or about November 11, 2004, plaintiff called Mr.

4  Holden to let him know that Casey Blim had told her that

5  someone else was being hired for the RMIT position in

6  Phoenix, Arizona. She also told Mr. Holden that her husband

7  was willing to move to Sacramento.  Mr. Holden told plaintiff

8  that he would talk with Mr. Martorello and get back to her.

9      66.  Plaintiff called Mr. Lang regarding Mr. Holden's

10 offer and he agreed it would be a perfect fit for both

11 plaintiff and Mr. Holden, and that they would work well

12 together. Mr. Lang indicated to plaintiff that he was very

13 excited for her.

14     67.  Mr. Lang had been very supportive of plaintiff

15 through the whole promotion process. He told plaintiff he

16 would talk to Bill Holden and Charlie Martorello for her.

17 That same evening plaintiff received a message from Mr.

18 Holden stating that Stefan Lang and Charlie Martorello were

19 meeting with him the following day, and he would let

20 plaintiff know the outcome.

21     68.  Plaintiff heard nothing from Mr. Lang, Mr. Holden

22 or Mr. Martorello the following day.

23     69.  On or about November 15, 2004, plaintiff saw Stefan

24 Lang at the Oakland Hilti Center. Plaintiff asked him if he

25 had heard anything about what was going on. Mr. Lang told

26 plaintiff he had talked with Bill Holden and that Mr. Holden

27 was very positive about plaintiff taking the position. Mr.

28 Lang said he was going to call Mr. Martorello and he would

1  get back to plaintiff later that day.

2      70.  Plaintiff heard nothing further.  On or about

3  November 17, 2004, plaintiff emailed Mr. Lang with just a

4  question mark. Mr. Lang emailed her back asking her to call

5  him that evening.

6      71.  On or about the evening of November 17, 2004,

7  plaintiff and her husband telephoned Mr. Lang.  During this

8  conversation, Mr. Lang told plaintiff that even though there

9  was no one else interviewing for the RMIT position in

10  Sacramento she could not have it.  Mr. Lang told plaintiff

11  there was no way of getting around Mr. Martorello.  Mr. Lang

12  told plaintiff that Mr. Martorello told him that there were

13  five other candidates for the position that were more

14  qualified than her.  Mr. Lang told plaintiff that she should

15  wait until January 2005, and talk to Vince Caggiano about his

16  group.

17      72.  It was during this conversation that Mr. Lang for

18  the first time, and contrary to all of his previous

19  statements to plaintiff of unqualified support for her

20  promotion to Regional Manager in Training (RMIT) and Regional

21  Manager, stated that just because plaintiff was an

22  exceptional sales person, that did not make her Regional

23  Manager material.  Mr. Lang also told plaintiff that not

24  everyone got what they wanted.

25      73.  On or about November 17, 2004, plaintiff received

26  an email from Bill Holden saying he was sorry that the RMIT

27  didn't work out and that he thought plaintiff would have been

28  a nice addition to his Bay Area team. He offered his help in

1  any way going forward.

2      74.  In or about February 2005 plaintiff was informed

3  that the Bay Area RMIT position was given to a 29 year old

4  male named Ryan Hartpence, a territory account manager in the

5  Los Angeles area. Plaintiff is informed and believes Mr.

6  Harpence's father had been a Regional Manager in the company

7  for over 25 years.

8      75.  On or about November 18, 2004, plaintiff called

9  defendant Hilti's legal department and spoke with a woman

10  named Mary Hughes about the events of the last eight months

11  or so. Ms. Hughes told plaintiff said she couldn't believe

12  what an emotional roller coaster plaintiff had been on during

13  that time. Ms. Hughes told plaintiff she was one of defendant

14  Hilti's most valuable employees. Plaintiff told Ms. Hughes

15  she had documentation of the events since March, including

16  emails and correspondence.  During this conversation

17  plaintiff stated her concerns of age discrimination and there

18  not being any women Regional Managers under Charlie

19  Martorello or the other four Vice-Presidents in the

20  Construction and Mechanical/Electrical sales groups. Ms.

21  Hughes told plaintiff to mail the information to her, that

22  she would review it, and she would do everything she could to

23  help plaintiff. Ms. Hughes said she would call plaintiff

24  after she reviewed it.  On or about November 18, 2004,

25  plaintiff emailed Mary Hughes a summary of what had

26  transpired since March 2004.

27      76.  On or about November 24, 2004, plaintiff received a

28  phone call from Kelly Beaver, Legal Counsel for defendant

1 Hilti.

2     77. Mr. Beaver told plaintiff that he was calling her

3 instead of Mary Hughes doing so. He told plaintiff that he

4 had not done a lot regarding her complaints but had talked to

5 Andre Sigenthaler, Marcus Oden and Charlie Martorello, who he

6 believed were generally familiar with the process and her

7 particular situation. Mr. Beaver told plaintiff that when

8 being considered for a promotion, it is a senior management

9 decision and not just that of her immediate supervisor, which

10 in her case was Stefan Lang.

11     78. Mr. Beaver said that Hilti's consideration of her

12 for promotion was based on the people she worked with and the

13 people she had worked with in the past. Mr. Beaver told

14 plaintiff that Mr. Martorello said she had done a great job

15 in her current position. Mr. Beaver went on to say that even

16 though plaintiff had done a great job, that didn't mean she

17 was going to be automatically considered for another

18 position.

19     79. Plaintiff pointed out that she had not asked to be

20 promoted but had been approached by her managers.

21     80. Mr. Beaver repeated that plaintiff had been doing

22 extremely well in the Senior Account Manager (SAM) position.

23 He told plaintiff that no one was arguing with her

24 performance in the sales positions she had been performing,

25 but that the consideration was whether she had the attributes

26 for a broader management type of position, as the discussion

27 had come up. Mr. Beaver said that without getting into

28 specifics, he just wanted to let her know how the process

1  worked. He said basically it was based on people who worked

2  with her, including Marcus Oden. Plaintiff told Mr. Beaver

3  that she had never worked directly with Marcus Oden in the

4  Bay Area, because he was in the Construction Division.

5      81.  Mr. Beaver ignored this point and said that he was

6  not saying that anyone had anything bad to say about her, but

7  that each person who may know her had their own perception of

8  how she would work with other people and whether she had the

9  experience, judgment, character and other attributes to be a

10  manager. Mr. Beaver said that these attributes were different

11  than the attributes for being in an individual sales

12  position.

13      82.  Plaintiff responded by saying she wouldn't have

14  been successful in her SAM position if she did not have each

15  of those attributes.

16      83.  Mr. Beaver told plaintiff that everyone was

17  delighted to have her back, but the question is whether

18  people believe that right now she was ready to be some type

19  of manager, whether it be a regional manager or something in

20  corporate. He said it was his understanding that she wanted

21  to go into a management position in sales. Plaintiff

22  confirmed this and pointed out that one of the reasons she

23  worked so hard in the SAM position was because she was told

24  by Stan Gilson when she was rehired in November 2003 that if

25  she was successful as a SAM, she could be a Regional Manager.

26      84.  Plaintiff pointed out that she had spoken with

27  Marcus Oden in May 2004, regarding Mr. Lang's request to

28  promote her to Regional Manger and that she had asked Mr.

1  Oden what training she would need. She pointed out that Mr.

2  Oden said nothing to her about not being qualified, but

3  rather had told her there was one pre-training class and

4  another one after she started the Regional Manager position.

5  Plaintiff asked what had changed.

6      85.  Mr. Beaver said the concern was whether plaintiff

7  was ready to go into a broader management role.  He told

8  plaintiff there was no dissatisfaction with her performance,

9  but the question was did the people involved see her being

10  ready to be a Regional Manager.

11      86.  Plaintiff asked what people.  Mr. Beaver said

12  Stephan Lang and especially Charlie Martorello. He also

13  generally referred to others that she had worked with.

14  Plaintiff responded by telling Mr. Beaver that Mr. Lang and

15  Mr. Gilson had made the decision that she was ready to be

16  promoted, and those were the two people that she had worked

17  directly with.

18      87.  Mr. Beaver repeated that no one was being critical

19  of her performance.  Plaintiff asked what they were critical

20  of.  Mr. Beaver said he had not asked that question. He said

21  he was just trying to figure out where they were in the

22  process and was trying to explain to her how the process

23  worked.  He said Marcus Oden's input was in knowing her from

24  the past, but that he wasn't a key player.

25      88.  Mr. Beaver said that one thing that had been

26  mentioned was that a next step for her should be a specialist

27  position, like a firestop specialist, a diamond specialist

28  one where she would work with a broader group of people and

1  have a chance to work with different teams of people, that it
2  was the logical step, not because of the sales experience but
3  because it was a broader step for working with other groups
4  of people. He told plaintiff that Mr. Martorello said this
5  would give her the opportunity to demonstrate what she could
6  do in a broader role.

7      89.  Plaintiff told Mr. Beaver that she had already
8  demonstrated this in her SAM position. She pointed out that
9  if this was the process, then why after 7 months with the
10 company, was Chris Tindiller, who was half her age and had no
11 experience, promoted into the RMIT from a regular account
12 manager position.

13     90.  Mr. Beaver responded that he couldn't really
14 comment on that.  He repeated that he saw her issue as
15 working with broader groups which is the next logical step
16 for a specialist position.

17     91. Plaintiff told Mr. Beaver that Mr. Martorello had
18 asked her to interview for two RMIT positions and that Bill
19 Holden had asked her if she wanted the RMIT position in
20 Sacramento. She asked Mr. Beaver why she was now being told
21 that she didn't have the attributes for an RMIT after she was
22 asked if she wanted the Sacramento RMIT position job. She
23 told Mr. Beaver that her understanding was that part of the
24 training for an RMIT was working with small groups of sales
25 representatives to learn the skills to be a Regional Manager;
26 and that now he was telling her that she had to be a
27 specialist first, which was a lateral move for her.

28     92.  Mr. Beaver told plaintiff the firestop position

1   would be an opportunity to open some doors for her with other
2   people, and asked whether she would be interested in
3   relocating for one of these firestop position roles.

4       93.  Plaintiff asked Mr. Beaver if that was her only
5   choice. Mr. Beaver asked plaintiff if she would consider the
6   specialist position if it was her only opportunity to expand
7   her experience and work with people in groups.

8       94.  Plaintiff again told Mr. Beaver that she had worked
9   with groups – in corporate and in the field. She asked Mr.
10  Beaver what specifically he was talking about. She told Mr.
11  Beaver she knew that Chris Tindiller definitely did not have
12  that experience because he was fresh out of college and the
13  account manager position was his first job.

14      95.  In response Mr. Beaver said he would be happy to
15  discuss any specific concerns she had, but he could not
16  really comment because he didn't know plaintiff. He told
17  plaintiff he knew that she had had great results since her
18  rehire.  He told plaintiff that he had been in a lot of
19  meetings with Mr. Martorello in which diversity issues were
20  discussed, that he believed that Mr. Martorello was just as
21  committed to those issues as anybody else within the company,
22  and was always looking to hire women.

23      96.  Plaintiff told Mr. Beaver that Mr. Martorello had
24  not promoted a woman to a Regional Manager position since in
25  or about 1995; that the woman, Betsy Starr, was a friend of
26  his wife; that they had a personal relationship; and that she
27  was the only woman he even had looked at for a RM position.

28      97.  Mr. Beaver acknowledged that Mr. Martorello did not

1  have any current female Regional Managers in his division,
2  but said he did promote Betsy Starr.  Plaintiff pointed out
3  that Ms. Starr had been promoted in 1995 and asked what about
4  since then.

5      98.  Mr. Beaver responded that whatever the reason was
6  for her promotion, Ms. Starr had been a Regional Manager. He
7  said he thought there had been a couple of other women in
8  specialist positions and that one of them was now a corporate
9  manager. He said he thought there were other women in
10 management in other divisions, that he didn't know who they
11 were, but that it was a starting place.

12     99.  Mr. Beaver told plaintiff that he thought she had a
13 different "take" on it than he did. He told her that from
14 what he had seen discrimination was not an issue with her not
15 being promoted.  Mr. Beaver told plaintiff that he thought
16 that Mr. Martorello was not convinced that she was ready for
17 a Regional Manager position.  He told plaintiff that if she
18 accepted a specialist role, and showed Mr. Martorello some
19 things, that maybe she could change his mind.

20     100.  Mr. Beaver told plaintiff that as her Vice-
21 President, Mr. Martorello was one of the most significant
22 players in her promotion. He said that other people like
23 Marcus Oden might have had some input, but he didn't know any
24 details.

25     101. Plaintiff asked Mr. Beaver again why she had to go
26 through this "process" when Chris Tindiller did not have to
27 go through this "process".  Mr. Beaver replied by telling
28 plaintiff that Mr. Tindiller was being groomed for management

1  in some special program. He told plaintiff that he would

2  check on that for her.

3      102.  Plaintiff responded by saying if Mr. Tindiller

4  could be groomed for management, why couldn't she be groomed

5  for management after 22 years of service.

6      103.  Mr. Beaver ignored her question and instead

7  suggested that plaintiff think about whether she was

8  interested in a firestop position or another specialist

9  position, and plan on meeting with other people like Vince

10 Caggiano and see how that would go.  Mr. Beaver told

11 plaintiff that Mr. Caggiano was a very good support person

12 for the Executive Management Group, that they could get Mr.

13 Caggiano's input on particular issues, that his input could

14 always be considered, and that these are the kind of things

15 that people don't always agree on.

16     104.  Mr. Beaver told plaintiff that he understood that

17 Mr. Lang might have told her she was ready for a promotion,

18 but to understand that just because her immediate supervisor

19 thought she was promotable didn't mean that other people

20 agreed with him, or that she didn't have to go through the

21 interview process, or that the person she interviewed with

22 had to make the right selection.  He told plaintiff that

23 other people had to agree and make the right assessment and

24 some people just weren't there yet.

25     105.  Mr. Beaver told plaintiff that was all he had to

26 say. He told plaintiff that they would look into this a

27 little bit more, but that based on the conversations he

28 already had with Charlie Martorello, Andre Sigenthaler, and

1  Marcus Oden, he did not think the denial of promotion was
2  related to her personally.  Plaintiff then asked what the
3  reason was.

4      106.  Mr. Beaver said he did not think it could be
5  pinpointed to anything specifically or a situation.  He told
6  plaintiff that it was not anything she had done wrong or
7  specifically any one thing. He said it appeared that
8  everybody thought since she had been rehired she had been
9  very successful and had done a wonderful job.  He said that
10  her excellent sales qualities did not have the makings of a
11  good manager. He said that some of the same qualities that
12  made the plaintiff a success in selling, may not transfer to
13  the managing profile that Hilti has.  He told plaintiff that
14  she was definitely quite talented and got things done really
15  well on her own, but that she did not have "for a lack of a
16  better word",  maybe patience to work with other people.  He
17  said maybe she was a star performer who had difficulty
18  working with others because she could not accept others who
19  were not as good as her.  Mr. Beaver said that Mr. Oden told
20  him that plaintiff thought she was better than everyone else
21  because she sold more than others.

22      107.  Plaintiff said "Excuse me. What did you say?" She
23  told Mr. Beaver that he could turn that around and say that
24  salesmen didn't like her because she performed better than
25  them. She told Mr. Beaver that the sales people who performed
26  well liked her and that she had great relationships with
27  them.

28      108.  Mr. Beaver said that as far as giving her an idea

1  of what she needed to fix or was lacking, he could not do
2  that. He told her he could not even pin point a specific
3  instance. He told her to try to enjoy her vacation and that
4  he would look into her complaint a little more.  However, Mr.
5  Beaver told her that he could say that Hilti's process was
6  working the way it was designed to work. He said the process
7  was to gather the input of various people so that there was
8  not any one person who could say yes or no.  He said the
9  process took into account everyone's past experience of
10 working with her and what their evaluation was of her.

11     109.  Plaintiff pointed out that she had never received
12 a bad evaluation from any of her immediate supervisors.

13     110.  Mr. Beaver said that it was kind of a
14 collaborative process.  He recommended to her – not as legal
15 advice or Human Resources advice - that if the issue Mr.
16 Martorello had expressed was patience, that she try to show
17 some patience, enjoy being back with Hilti, and pursue
18 additional opportunities like a firestop position that might
19 come up and so forth. He said she should be proactive with
20 Mr. Martorello and if the issue was patience, ask him to tell
21 her what she can do.

22     111.  Plaintiff told Mr. Beaver that she had asked Mr.
23 Martorello on at least two occasions to give her specifics
24 and that he would not give her one example of what he was
25 talking about or when she had shown a lack of patience.

26     112.  Mr. Beaver did not respond to plaintiff's
27 information. Instead, he told plaintiff that part of the
28 issue was that she had only been back with Hilti for one

1   year.

2      113.  Plaintiff told Mr. Beaver that she had 21 years of

3   very successful sales and corporate experience before

4   returning a year before. She asked Mr. Beaver how long Chris

5   Tindiller had been with the company

6      114.  Mr. Beaver ignored her question. Instead, he told

7   plaintiff that he had tried to be as open with her as

8   possible and that before they spoke any further, he needed to

9   do some further research.  Mr. Beaver told plaintiff he would

10  get back to her after she returned from vacation.

11     115.  Plaintiff never heard from Mr. Beaver or anyone

12  else from Hilti's legal department again.

13     116.  On or about November 23, 2004, plaintiff received

14  an email from Mr. Martorello requesting a meeting on December

15  9, 2004, with Mr. Lang and himself to discuss plaintiff's

16  career "ambitions" and the results of the recent decisions on

17  the Phoenix, Arizona and Sacramento, California RMIT

18  positions. Plaintiff agreed to the meeting.

19     117.  On or about December 9, 2004, plaintiff met with

20  Mr. Martorello and Mr. Lang.  During this meeting, Mr.

21  Martorello told plaintiff he wanted her to interview for a

22  Portland Firestop position. During this meeting he gave no

23  indications as to what qualifications she was lacking to be a

24  RMIT, or why after all that had transpired over an 8 month

25  period, he would not promote her. He just stated that Mr.

26  Lang had "jumped the gun". He did state that he never

27  promoted anyone directly from a sales position into a

28  Regional Manager's position. He said the person had to be a

1  Specialist first.

2      118.   Mr. Martorello told plaintiff he thought she

3  should be a Firestop Specialist so she could work directly

4  with other sales people. He said he had a Firestop position

5  in Portland/Seattle if she wanted to interview for it.

6  Plaintiff told him she would think about it over Christmas

7  vacation. She told Mr. Martorello that she was going to take

8  two or three weeks off for Christmas, and that her husband

9  was so disappointed in the way Hilti had treated her, they

10 had some things regarding their futures to talk about.

11     119.   Both of the RMIT positions plaintiff was denied

12 were filled by younger males directly from sales positions.

13     120.   In December 2004 plaintiff's year-end performance

14 with defendant Hilti was outstanding.  She was the number one

15 ranked SAM in the company.  Her performance review for the

16 year 2004 gave her the highest rating, "Outstanding".  The

17 December 2004 Year to Date Ranking showed that plaintiff was

18 the number one ranked Account Manager in the Western division

19 with 188.7% of forecasted sales and the number four ranked

20 Account Manager with 282.3% growth over prior year. Plaintiff

21 is informed and believes that in December 2004 of the ninety-

22 two (92) Regional Manager positions at Hilti only three (3)

23 were held by females, all in the Industrial Division.

24     121.   Plaintiff spoke with Stefan Lang on or about

25 December 10, 2004. She asked Mr. Lang what he thought of what

26 Mr. Martorello said in the meeting. Mr. Lang commented to

27 plaintiff: "Don't you get it?"  Mr. Lang told plaintiff it

28 did not matter what she did or how she performed. Mr. Lang

1  told plaintiff that she would never be promoted to a Regional

2  Manager position under Mr. Martorello. Mr. Lang told

3  plaintiff that what had transpired was not about her or about

4  her performance; it was all about Mr. Martorello.

5      122.  During the holidays, plaintiff's husband and she

6  agreed that it was time for him to apply for promotable

7  positions within his company. Up to that time plaintiff's

8  husband had held off on seeking a promotion of his own within

9  his company, based on the representations made to plaintiff

10 by Hilti's management that she would be promoted to Regional

11 Manager. Plaintiff's husband applied for 20 new manager

12 positions that had just been created throughout the U.S.

13     123.  After being denied two promotions by Mr.

14 Martorello, being told that Mr. Martorello would not promote

15 her to an RMIT position, and having been told by Mr.

16 Martorello that he wanted her to be a specialist (which was a

17 lateral transfer) as her next step, it was clear to plaintiff

18 that she would not receive a promotion working in the Western

19 Division under Mr. Matorello.

20     124.  In or about early January 2005 plaintiff met with

21 Vince Caggiano. There were three female Regional Mangers in

22 his divison. Mr. Caggiano and plaintiff  talked about the

23 events regarding her possible promotion. Mr. Caggiano

24 acknowledged that Mr. Martorello had a history of not

25 promoting women into the Regional Manager position, and

26 commented that at that time, he (Mr. Caggiano) was the only

27 VP who had any women Regional Managers. Mr. Caggiano again

28 stated that plaintiff was more than qualified for the

1  position, and he would have no problems hiring her into a

2  position as Regional Manager if he had a vacancy.

3      125.  Plaintiff never received an invitation for an

4  interview for the Portland/Seattle Firestop position during

5  December and was never interviewed for that position.

6      126.  On or about January 3, 2005, plaintiff received an

7  e-mail from Tim Wenderland, the Director of Firestop,

8  regarding interviewing for a firestop position in Denver.

9  Plaintiff flew to Denver on or about January 5, 2005, and

10 interviewed with Mr. Wenderland for approximately three hours

11 at the Denver airport before she flew home.

12      127.  At the start of the interview, Mr. Wenderland

13 questioned why plaintiff was interviewing for the position.

14 He told plaintiff he thought it was a waste of time for her

15 and that she was overqualified for the position. Plaintiff

16 told Mr. Wenderland what Mr. Martorello had said about

17 working with other salespeople. Mr. Wenderland told plaintiff

18 that she would learn more from an RMIT position about working

19 with account managers than she would from a firestop

20 position.  He also told her the firestop position required

21 traveling to five states, five days a week.

22      128.  Mr. Wenderland told plaintiff to let him know by

23 the end of the following week if she wanted the position.

24 Plaintiff told Mr. Wenderland at that time that her husband

25 had a call the night before about a job in Atlanta and she

26 was not exactly sure where that was going. Mr. Wenderland

27 told her to call him and let him know the outcome.

28      129.  When plaintiff got home that night, her husband

1  told her they were going to Atlanta, Georgia that weekend, so
2  he could interview on or about January 10, 2005, and they
3  would have the weekend to look around Atlanta.

4      130. Before going to Atlanta, plaintiff spoke with
5  Stefan Lang. Plaintiff told Mr. Lang she was very upset over
6  the Denver interview, and maybe it was time to let her
7  husband receive a promotion. She told Mr. Lang that she was
8  going to Atlanta that weekend with her husband, and would
9  call him after the interview.

10     131.  Plaintiff then called Mr. Lang on or about January
11  10, 2005, to tell him that her husband had been promoted to a
12  position in Atlanta, Georgia and they would be moving there.
13  This meant that plaintiff would then have to give up her
14  position in California as Senior Account Manager.

15     132.  On or about January 13, 2005 while house hunting
16  in Atlanta, Mr. Lang arranged for plaintiff to meet with Clay
17  Hammond, Hilti, Inc.'s District Manager in Atlanta, Georgia
18  to discuss a position in the Atlanta area.  Mr. Hammond told
19  plaintiff that he had no open positions at that time but
20  that she could transfer to Atlanta and that he would come up
21  with a job for her.

22     133. When plaintiff arrived back in California from
23  Atlanta on or about January 17, 2005, she had a meeting with
24  Stefan Lang regarding her annual job performance review. In
25  that review plaintiff received an outstanding job performance
26  rating from Mr. Lang and Charlie Martorello. There was
27  nothing in the review that stated plaintiff needed any
28  additional training to be a RMIT or a Regional Manager, or

1  that she had any of the personal issues raised by Mr.
2  Martorello and Mr. Beaver.

3      134.  Plaintiff asked Mr. Lang what Chris Tindiller and
4  Mr. Hardpence had that she did not have. Mr. Lang said "Oh
5  Debbie, you are moving now and getting a new home, what does
6  it matter?"

7      135.  Before plaintiff moved to the Atlanta, Georgia
8  area she saw Bill Holden. Plaintiff asked him what
9  qualifications Ryan Hartpence had over her. Mr. Holden stated
10 that he was again so sorry that the RMIT didn't work out and
11 that didn't she realize that she needed to move on to another
12 area and get away from Charlie Martorello.

13     136. Plaintiff is informed and believes that Hilti had a
14 need for Senior Account Manager or an equivalent or
15 substantially similar position in the Atlanta, Georgia area
16 and could have allowed plaintiff to transfer to Atlanta in
17 such a capacity.  This would have enabled her to continue
18 working in the same level or substantially the same level
19 position she held in California, which she had been told by
20 Mr. Lang was a stepping stone to a promotion to an RMIT or
21 Regional Manager. However, Hilti, refused to transfer
22 plaintiff laterally to a position in the Atlanta, Georgia
23 area. The only position offered to plaintiff by Mr. Hammond
24 was that of an Account Manager, which was a demotion and a
25 significant cut in pay.  However, the Account Manager
26 position included extra job duties similar to an RMIT
27 position, including coaching and teaching the Atlanta
28 Mechanical/Electrical team of Account Managers on successful

1  selling and co-managing the team along with Pete Schnyder,
2  the Regional Manager.

3      137.  By this time plaintiff still had not been
4  contacted by Hilti's legal department or anyone else
5  regarding her complaint of gender and age discrimination.
6  Plaintiff believed that her complaint was being ignored and
7  that Hilti was not going to take any steps to resolve her
8  complaint.

9      138. Plaintiff and her husband moved to the Atlanta,
10 Georgia area on or about March 14, 2005.  At that time she
11 was on vacation. The next week or so, and while still on
12 vacation, plaintiff met with Mr. Hammond. She asked Mr.
13 Hammond how long she would have to work as an Account Manager
14 before being promoted. Mr. Hammond stated it depended on how
15 well she did. She pointed out to him that she had already
16 reached the highest level of success as a Senior Account
17 Manager and asked him what else she could do to be promoted.
18 Mr. Hammond was very vague and essentially indicated that
19 there was nothing that plaintiff could do to work toward
20 being promoted. Plaintiff also was going to be required to
21 drive two hours each way from her home to reach her customers
22 under her new job duties as an account manager.  It was clear
23 to plaintiff that she had little or no possibility of
24 promotion any longer with Hilti.  Plaintiff believed that she
25 was being pushed backward 12 years in her career path by
26 Hilti.

27     139.  Plaintiff started working in her new position on
28 or about April 17, 2005. After working three days in her new

1    position in Georgia, she felt compelled to quit, based on the

2    intolerable working conditions she was facing related to the

3    pattern of discrimination she had been experiencing from

4    Hilti, which was based on her gender (female)and her age (49

5    at the time).

6         140.  Plaintiff faced an ongoing pattern of

7    discrimination based on her gender and age in terms of

8    advancing her career with Hilti, including, without

9    limitation, discrimination in promotions; discrimination in

10   terms of being placed in jobs with better opportunities in

11   terms of monetary compensation, duties, training, and/or

12   potential advancement; discrimination in training;

13   discrimination in terms of receiving equal opportunities to

14   earn higher pay; discrimination in placing her in jobs;

15   discrimination in placing alleged requirements, obstacles,

16   stepping stones, and qualifications in her way of advancing

17   while not placing those requirements, obstacles, stepping

18   stones, and qualifications in the way of other applicants not

19   in her protected category; discrimination in terms of

20   correlating duties assigned her with status, pay, and title

21   of job position; harassment and hostile work environment

22   which acted to interfere with advancing her career; gender-

23   based and/or age-based retaliation against her for opposing

24   discrimination regarding her career advancement and related

25   matters thereto (e.g., her opposing gender discrimination

26   acted in turn to reinforce and aggravate discriminatory

27   feelings based on a view she was an allegedly assertive, non-

28   team oriented, impatient woman, which in turn influenced

1  employment decisions made toward her adversely affecting her

2  career advancement, when the same characteristics in a male

3  would not have been viewed that way; and other discrimination

4  in employment opportunities.

5                     FIRST CAUSE OF ACTION

6   (VIOLATION OF TITLE VII--SEX DISCRIMINATION AND RETALIATION,

7              BROUGHT AGAINST DEFENDANT HILTI INC.)

8      141.  Plaintiff refers to the allegations of paragraphs

9  1-140 of this complaint, and incorporates the same herein by

10  this reference as though set forth in full.

11      142.  Plaintiff has exhausted in a timely fashion all

12  administrative requirements prior to filing an action for

13  violation of Title VII, and is bringing this action in a

14  timely fashion, within 90 days after receiving a right to sue

15  notice by the U.S. Equal Employment Opportunity Commission,

16  which was dated March 9, 2007

17      143.  Defendant Hilti, Inc. violated 42 U.S.C. Section

18  2000e-2, in that it discriminated against plaintiff on the

19  basis of her sex (female), in terms of advancing her career

20  with Hilti, including, without limitation, in discriminating

21  against her in terms of promotions; in discriminating against

22  her in terms of being placed in jobs with better

23  opportunities in terms of monetary compensation, duties,

24  training, and/or potential advancement; in terms of

25  discriminating against her in terms of training; in terms of

26  discriminating against her in terms of receiving equal

27  opportunities to earn higher pay; in terms of discriminating

28  against her in terms of placing her in jobs; in terms of

1  discriminating against her in terms of placing alleged
2  requirements, obstacles, stepping stones, and qualifications
3  in her way of advancing while not placing those requirements,
4  obstacles, stepping stones, and qualifications in the way of
5  other applicants not in her protected category; in terms of
6  discriminating against her in terms of correlating duties
7  assigned her with status, pay, and title of job position; in
8  terms of harassment and hostile work environment which acted
9  to interfere with her advancing her career; in terms of
10 gender-based retaliation against her for opposing
11 discrimination regarding her career advancement and related
12 matters thereto, and which in turn was aimed at reinforcing
13 and also acted to reinforce sex discrimination (e.g., her
14 opposing gender discrimination acted in turn to reinforce and
15 aggravate discriminatory feelings based on a view she was an
16 allegedly assertive, non-team oriented, impatient woman,
17 which in turn influenced employment decisions made toward her
18 which adversely affected advancement of her career, when the
19 same characteristics in a male would not have been viewed
20 that way; and in terms of other discrimination in employment
21 opportunities. Based on and related to the aforesaid
22 discrimination against plaintiff based on her sex (female),
23 plaintiff ultimately was forced to quit her employment with
24 defendant and was constructively discharged by defendant from
25 her employment.

26      144.   Defendant Hilti, Inc. violated 42 U.S.C. Section
27 2000e-3, in that it discriminated against plaintiff,
28 including, without limitation, in terms of plaintiff

1  advancing her career, based on and related to her opposing

2  discrimination in violation of Title VII.  Related thereto,

3  said discrimination contributed to the intolerable conditions

4  plaintiff already faced from the other unlawful conduct she

5  was being subjected to, as set forth elsewhere herein, and

6  related thereto plaintiff was ultimately forced to quit her

7  employment with defendant and was constructively discharged

8  by defendant from her employment.

9      145.  As a proximate result of said violations of Title

10  VII by defendant, plaintiff has sustained, and continues to

11  sustain, economic damages plus prejudgment interest thereon in

12  an amount to be shown according to proof.

13      146.  As a further proximate result of said violations of

14  Title VII by defendant, plaintiff has suffered, and continues

15  to  suffer,  emotional  distress,  mental  anguish,  shame,

16  embarrassment,  humiliation,  pain  and  suffering,  loss  of

17  enjoyment of life, and injury to reputation, in an amount in

18  excess of the amount required to be in controversy to invoke

19  the original jurisdiction of this Court, to be shown according

20  to proof.

21      147.  As  a  further  proximate  result  of  defendant's

22  unlawful conduct, plaintiff has incurred health-related costs

23  and expenses in an amount to be shown according to proof.

24      148.  The  aforesaid  conduct  of  defendant  was  willful,

25  malicious,  and  oppressive,  and  plaintiff  is  entitled  to  an

26  award of punitive damages in an amount to be shown according

27  to proof.

28      149.  Plaintiff  is  entitled  to  appropriate  equitable

1  relief including, without limitation, reinstatement or front

2  pay in lieu thereof, appropriate seniority, promotions and pay

3  increases, appropriate expungement of her employment records,

4  and removal and correction of any adverse effects of

5  defendant's discriminatory conduct.

6      150.  Plaintiff has had to hire attorneys to prosecute

7  the matter herein, and is entitled to an award of reasonable

8  attorneys' fees and costs, according to proof.

9      WHEREFORE, plaintiff prays judgment against defendant  as

10  set forth below.

11                   SECOND CAUSE OF ACTION

12      (VIOLATION OF ADEA, AGAINST DEFENDANT HILTI INC.)

13      151.  Plaintiff refers to the allegations of paragraphs

14  1-140 of this complaint, and incorporates the same herein by

15  this reference as though set forth in full.

16      152.  Plaintiff has exhausted in a timely fashion all

17  administrative requirements prior to filing an action under 29

18  U.S.C. Section 626, the Age Discrimination in Employment Act,

19  and has waited more than 60 days from the filing of

20  administrative charges with the Equal Employment Opportunity

21  Commission to file the action herein.

22      153.  Defendant Hilti, Inc. knowingly and willfully

23  violated 29 U.S.C. Section 623(a) in that it discriminated

24  against plaintiff on the basis of her age, including, without

25  limitation, in that it discriminated against her based on age

26  in terms of advancing her career with Hilti, including,

27  without limitation, discrimination in promotions;

28  discrimination in terms of being placed in jobs with better

opportunities in terms of monetary compensation, duties, training, and/or potential advancement; discrimination in training; discrimination in terms of receiving equal opportunities to earn higher pay; discrimination in placing her in jobs; discrimination in placing alleged requirements, obstacles, stepping stones, and qualifications in her way of advancing while not placing those requirements, obstacles, stepping stones, and qualifications in the way of other applicants not in her protected category; discrimination in terms of correlating duties assigned her with status, pay, and title of job position; harassment and hostile work environment which acted to interfere with advancing her career; and other discrimination in employment opportunities. Based on and related to the aforesaid discrimination based on her age, plaintiff ultimately was forced to quit her position and was constructively discharged related thereto.

154. As a proximate result of defendant's violation of 29 U.S.C. Section 623(a), plaintiff has suffered, and continues to suffer, economic loss plus prejudgment interest thereon in an amount to be shown according to proof.

155. Defendant's violation of 29 U.S.C. Section 623(a) was knowing, reckless, and willful, and plaintiff is entitled to an additional amount as and for liquidated damages equal to the economic damages awarded in this matter.

156. As a further proximate result of defendant's violation of 29 U.S.C. Section 623(a), plaintiff is entitled to appropriate equitable relief including, without limitation, reinstatement or front pay in lieu thereof, appropriate

1  seniority,   promotions   and   pay   increases,   appropriate
2  expungement   of   her   employment   records,   and   removal   and
3  correction   of   any   adverse   effects   of   defendant's
4  discriminatory conduct.

5      157. Plaintiff has been compelled to engage the services
6  of attorneys in order to prosecute the action herein, and is
7  accordingly entitled to an award of reasonable attorneys' fees
8  and costs.

9      WHEREFORE, plaintiff prays judgment against defendant as
10  set forth below.

11                    THIRD CAUSE OF ACTION
12  (VIOLATION OF CALIFORNIA FAIR EMPLOYMENT AND HOUSING ACT'S SEX
13      DISCRIMINATION, RETALIATION, AND AGE DISCRIMINATION
14       PROVISIONS, BROUGHT AGAINST DEFENDANT HILTI, INC.)

15      158. Plaintiff refers to the allegations of paragraphs
16  1-140 of this complaint, and incorporates the same herein by
17  this reference as though set forth in full.

18      159. Plaintiff has exhausted all administrative remedies
19  required of her prior to bringing this cause of action for
20  violation of the California Fair Employment and Housing Act,
21  and is bringing this action in a timely fashion.

22      160.  Defendant Hilti, Inc. discriminated against
23  plaintiff based on her sex (female) in violation of the
24  California Fair Employment and Housing Act, California
25  Government Code Sections 12940 et seq., including, without
26  limitation, in that it discriminated against plaintiff based
27  on her sex (female) in terms of advancing her career with
28  Hilti, including, without limitation, in discriminating

1  against her in terms of promotions; in discriminating against

2  her in terms of being placed in jobs with better

3  opportunities in terms of monetary compensation, duties,

4  training, and/or potential advancement; in terms of

5  discriminating against her in terms of training; in terms of

6  discriminating against her in terms of receiving equal

7  opportunities to earn higher pay; in terms of discriminating

8  against her in terms of placing her in jobs; in terms of

9  discriminating against her in terms of placing alleged

10  requirements, obstacles, stepping stones, and qualifications

11  in her way of advancing while not placing those requirements,

12  obstacles, stepping stones, and qualifications in the way of

13  other applicants not in her protected category; in terms of

14  discriminating against her in terms of correlating duties

15  assigned her with status, pay, and title of job position; in

16  terms of harassment and hostile work environment which acted

17  to interfere with her advancing her career; in terms of

18  gender-based retaliation against her for opposing

19  discrimination regarding her career advancement and related

20  matters thereto, and which in turn was aimed at reinforcing

21  and also acted to reinforce sex discrimination (e.g., her

22  opposing gender discrimination acted in turn to reinforce and

23  aggravate discriminatory feelings based on a view she was an

24  allegedly assertive, non-team oriented, impatient woman,

25  which in turn influenced employment decisions made toward her

26  which adversely affected advancement of her career, when the

27  same characteristics in a male would not have been viewed

28  that way; and in terms of other discrimination in employment

49

1  opportunities. Based on and related to the aforesaid

2  discrimination against plaintiff based on her sex (female),

3  plaintiff ultimately was forced to quit her employment with

4  defendant and was constructively discharged by defendant from

5  her employment.

6      161.    Defendant Hilti, Inc. discriminated against

7  plaintiff based on her age in violation of the California Fair

8  Employment and Housing Act, California Government Code

9  Sections 12940 et seq., including, without limitation, in that

10  it discriminated against her based on her age in terms of

11  advancing her career with Hilti, including, without

12  limitation, discrimination in promotions; discrimination in

13  terms of being placed in jobs with better opportunities in

14  terms of monetary compensation, duties, training, and/or

15  potential advancement; discrimination in training;

16  discrimination in terms of receiving equal opportunities to

17  earn higher pay; discrimination in placing her in jobs;

18  discrimination in placing alleged requirements, obstacles,

19  stepping stones, and qualifications in her way of advancing

20  while not placing those requirements, obstacles, stepping

21  stones, and qualifications in the way of other applicants not

22  in her protected category; discrimination in terms of

23  correlating duties assigned her with status, pay, and title

24  of job position; harassment and hostile work environment

25  which acted to interfere with advancing her career; and other

26  discrimination in employment opportunities. Based on and

27  related to the aforesaid discrimination against plaintiff

28  based on her age, plaintiff ultimately was forced to quit her

1 | position and was constructively discharged related thereto.

2 |     162.  Defendant Hilti, Inc. violated the California Fair

3 | Employment and Housing Act, including, without limitation,

4 | California Government Code Section 12940(h), in that it

5 | discriminated against plaintiff, including, without

6 | limitation, in terms of plaintiff advancing her career, based

7 | on and related to her opposing practices forbidden by the

8 | California Fair Employment and Housing Act.  Related thereto,

9 | said discrimination contributed to the intolerable conditions

10 | plaintiff faced from sex and age discrimination, and related

11 | thereto plaintiff was ultimately forced to quit her

12 | employment with defendant and was constructively discharged

13 | by defendant from her employment.

14 |     163.  As a proximate result of said unlawful conduct by

15 | defendant, plaintiff has sustained, and continues to sustain,

16 | economic damages plus prejudgment interest thereon in an

17 | amount to be shown according to proof.

18 |     164.  As a further proximate result of said wrongful

19 | conduct by defendant, plaintiff has suffered, and continues to

20 | suffer, emotional distress, mental anguish, shame,

21 | embarrassment, humiliation, pain and suffering, loss of

22 | enjoyment of life, and injury to reputation, in an amount in

23 | excess of the amount required to be in controversy to invoke

24 | the original jurisdiction of this Court, to be shown according

25 | to proof.

26 |     165.  As a further proximate result of defendant's

27 | unlawful conduct, plaintiff has incurred health-related costs

28 | and expenses in an amount to be shown according to proof.

1    166. The aforesaid conduct of defendant was willful,
2  malicious, and oppressive, and plaintiff is entitled to an
3  award of punitive damages in an amount to be shown according
4  to proof.

5    167. Plaintiff is entitled to appropriate equitable
6  relief including, without limitation, reinstatement or front
7  pay in lieu thereof, appropriate seniority, promotions and pay
8  increases, appropriate expungement of her employment records,
9  and removal and correction of any adverse effects of
10  defendant's discriminatory conduct.

11    168. Plaintiff has had to hire attorneys to prosecute
12  the matter herein, and is entitled to an award of reasonable
13  attorneys' fees and costs, according to proof.

14    WHEREFORE, plaintiff prays judgment against defendant as
15  follows:

16    1. On the First Cause of Action, for general damages and
17  special damages according to proof; for punitive and exemplary
18  damages, for appropriate equitable relief under Title VII
19  including, without limitation, reinstatement or front pay in
20  lieu thereof, appropriate seniority, promotions and pay
21  increases, appropriate expungement of her employment records,
22  and removal and correction of any adverse effects of
23  defendant's discriminatory conduct; and for an award of
24  reasonable attorneys' fees, according to proof.

25    2. On the Second Cause of Action, for economic loss plus
26  prejudgment interest, according to proof, for an additional
27  liquidated amount of damages equal to economic loss (in
28  addition to the award for economic loss), and for appropriate

equitable relief under the ADEA, including, without limitation, reinstatement or front pay in lieu thereof, appropriate seniority, promotions and pay increases, appropriate expungement of her employment records, and removal and correction of any adverse effects of defendant's discriminatory conduct, and for an award of reasonable attorneys' fees, according to proof.

3.   On the Third Cause of Action, for general damages and special damages according to proof; for punitive and exemplary damages, for appropriate equitable relief under the California Fair Employment and Housing Act including, without limitation, reinstatement or front pay in lieu thereof, appropriate seniority, promotions and pay increases, appropriate expungement of her employment records, and removal and correction of any adverse effects of defendant's discriminatory conduct; and for an award of reasonable attorneys' fees, according to proof.

4.   For an award of reasonable attorneys' fees;

5.   For costs of suit; and

6.   For such other and further relief as this Court deems just and proper.

DATED:   June 7, 2007.        LOUIS A. HIGHMAN, ESQ.
                              BRUCE J. HIGHMAN, ESQ.
                              HIGHMAN, HIGHMAN & BALL


                              By_____
                                 Attorneys for Plaintiff
                                 DEBRA RODRIGUEZ

1              DEMAND FOR JURY TRIAL

2      Plaintiff Debra Rodriguez, by and through her attorneys,

3  hereby demands a jury trial in the above-entitled action.

4    DATED:   June 7, 2007.      LOUIS A. HIGHMAN, ESQ.
                                 BRUCE J. HIGHMAN, ESQ.
5                                HIGHMAN, HIGHMAN & BALL

6

7                             By_____
                                Attorneys for Plaintiff
8                               DEBRA RODRIGUEZ

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Complaint—Debra Rodriguez v. Hilti, Inc.